# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **KEVIN HARRIS,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:19CV00003 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **FREIGHT HANDLERS, INC., ET AL.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Richard N. Shapiro, Shapiro & Appleton, P.C., Virginia Beach, Virginia, for Plaintiff; Nathan H. Schnetzler, Sean C. Workowski, and Katie M. DeCoster, Frith Anderson + Peake, Roanoke, Virginia, for Defendants.*

In this civil case invoking the court's diversity jurisdiction, the plaintiff, who suffered a workplace injury, asserts a state law negligence claim against a freight unloading company that employed the person who injured him. The defendant argues that the exclusivity provision of the Virginia Workers' Compensation Act ("VWCA" or "Act") bars the plaintiff's claim because the unloading company was not an "other party" under the Act. I find that the Act's exclusivity provision does not affect this court's subject matter jurisdiction, and I will treat the defendant's dispositive motion as a Motion for Summary Judgment under Federal Rule of Civil Procedure 56. For the reasons that follow, I conclude that the plaintiff's claim is not barred by the Act, and I will deny the defendant's motion.

I.

The facts in this case are largely uncontested. The following facts are taken from the summary judgment record and, unless otherwise noted, are undisputed.

Shane Matney, who was operating a forklift, backed over plaintiff Kevin Harris's lower leg at the K-VA-T Food Stores Inc. ("KVAT") distribution facility in Abingdon, Virginia. Matney was an employee of defendant FHI, LLC ("FHI"),[1] a contractor that unloaded deliveries to the warehouse, and Harris was employed by KVAT as a receiver, also known as a checker.

KVAT operates approximately 150 Food City and Super Dollar stores in Virginia, Kentucky, Tennessee, and Georgia. The majority of the products sold at those stores are initially delivered to the KVAT distribution center in Abingdon, Virginia, where they are stored and shipped to individual stores on KVAT trucks. At the time of the accident at issue in this case, a Freight Unloading Agreement ("Agreement") governed the relationship between FHI and KVAT. FHI was to provide employees, under its exclusive direction and control, to perform FHI's duties under the Agreement. Reid Durst, an FHI executive, testified that FHI was in the professional unloading industry and that was its core business.

---

[1] Freight Handlers, Inc. is also named as a defendant, but it asserts that it should be dismissed because the undisputed facts establish that it was not Matney's employer. The plaintiff concedes this and consents to the dismissal of Freight Handlers, Inc. I will therefore grant Freight Handlers, Inc.'s Motion to Dismiss for failure to state a claim. Throughout this opinion, the word "defendant" refers to FHI, LLC.

FHI employees unload trucks of third-party shippers making deliveries to the KVAT distribution center. FHI provides these services at the warehouses of numerous other grocery chains in addition to KVAT. The drivers of the trucks decide whether to use FHI's services. They have the option of unloading the trucks themselves, and if they choose to do that, KVAT will provide them a pallet jack to use. KVAT will not allow truck drivers to use its forklifts because it cannot verify the drivers' certifications. Before KVAT entered into the Agreement with FHI, KVAT allowed its employees who were off-duty to unload incoming deliveries as so-called lumpers, which are essentially independent contractors that drivers or shippers pay to unload trailers. Thus, before the Agreement was in effect, KVAT employees were doing the work that is now performed by FHI, but not while they were on-duty for or being paid by KVAT.

The forklifts and other equipment that FHI employees used to unload trailers are owned by KVAT. Under the Agreement, FHI pays KVAT a rental fee to use the unloading equipment as well as for office space at the distribution center and use of breakrooms, parking areas, and telecommunications systems. The rental fee is not a flat rate, but rather is a percentage (approximately one third) of the amount collected by FHI from shippers for the unloading services it provides at the distribution center.

Melvin L. Chancey, II, FHI's Vice President of Operations, testified at the company's Rule 30(b)(6) deposition that FHI supervises its own employees in their unloading of trucks "at the direction of the Food City Management." Defs.' Mem. Supp. Ex.1, FHI 30(b)(6) Dep. 10, ECF No. 35-1.[2] The order in which pallets are unloaded is decided by FHI supervisors, not KVAT. FHI has the exclusive right to select and hire employees and determine the terms and conditions of their employment. FHI trains its employees who work in the distribution center. The Agreement states that FHI will supervise operators of unloading equipment (such as forklifts) to ensure compliance with federal safety regulations. FHI provides training materials to its employees. Matney's job description was written by FHI. FHI has its own proprietary computer system to which KVAT does not have access.

The Agreement states that FHI shall be responsible for loss and damage claims caused by the willful, reckless, or negligent acts of FHI employees. FHI also agreed to carry liability and workers compensation insurance for the activities covered by the Agreement. The Agreement states that KVAT gives FHI exclusive rights to provide unloading services to carriers hauling freight to the distribution center. In other words, FHI has the exclusive right to unload inbound deliveries.

---

[2]    Because of the ubiquitous "Food City" brand name, I assume that Chancey meant KVAT management.

FHI unloads a majority of KVAT's own trucks making deliveries to the facility, but there are occasions when KVAT, in its discretion, has its employees unload KVAT's trucks. One witness testified that FHI unloads 95% of the deliveries to the distribution center. When a vendor truck comes to the facility, an FHI lead employee talks to the driver and gives the driver a rate for unloading the truck. The FHI lead then assigns the unloading to an FHI handler. After FHI has unloaded the truck and a KVAT receiver has checked the load and verified that all the expected freight is present and in good condition, an FHI employee tells the driver the final price for unloading. An FHI employee can process credit card payments from drivers at the facility, immediately after unloading is complete. KVAT is not involved in this payment processing. The methods and manner of unloading the trailers are determined by FHI, not KVAT. FHI does not collect fees for unloading from the driver until a KVAT receiver has checked and accepted the product.

FHI's primary duty at the distribution facility is to unload inbound deliveries from third-party shippers. Freight handlers like Matney use forklifts and power jacks to remove products from trailers. After the accident at issue, FHI conducted an investigation. FHI supervisor John Sawyer terminated Matney because he had violated various FHI safety rules, including not looking in the direction of travel, not wearing a seatbelt while operating the forklift, and wearing a hooded sweatshirt

with the hood up.  KVAT played no role in Matney's termination and does not

play a role in terminating any of FHI's employees.

Most of the trucks being unloaded are vendor or manufacturer trucks, not

KVAT trucks.  Exceptions are so-called backhauls, in which KVAT trucks bring a

shipper's trailer containing merchandise into the distribution facility on the way

back from making a delivery to one of KVAT's stores, and transfers, where KVAT

trucks move products from one KVAT location to another.  In addition to the

incoming deliveries, FHI unloads most of the backhauls.  KVAT does not own the

incoming product until it has been counted and received, after delivery and

unloading.  Thus, at the time FHI is unloading the trailers, KVAT does not yet own

the merchandise.  Chancey considers the unloading services FHI provides to be the

last step of the delivery process.[3]  When a load comes into the warehouse, a KVAT

receiver determines whether it is an inbound vendor load or a backhaul or transfer.

The purchase order issued by KVAT and given to an FHI handler details

how many cases should be on a pallet layer and how many layers high will fit on

KVAT's warehouse racks.  These specifications are known as the tie-high.  The

FHI handler uses this information from the tie-high sheet attached to the purchase

---

[3] This inconsistency is noteworthy.  Chancey, FHI's Rule 30(b)(6) representative, testified that FHI's services are merely part of the delivery process.  FHI's counsel, attempting to invoke the workers' compensation bar, argues the opposite: that unloading and stacking incoming product is not an act of delivery, but an essential part of KVAT's trade or business.  Defense counsel attempts to disavow Chancey's testimony on this point by asserting that this is really a legal conclusion rather than a question of fact.

order to ensure each item is at the right tie-high. If the receiver saw that the count or tie-high was wrong, the receiver would notify the FHI lead and the lead would ask a handler to fix it. The receiver also checks pallet quality and notifies the FHI handler if the pallet seems unsafe or if any of the product is damaged. Often when unloading and stacking items, in order to meet the tie-high requirements, the FHI handler must take apart pallets and arrange the products into new pallet configurations. If the product came to the warehouse on an unacceptable pallet, the KVAT receiver takes up the issue with the shipper, but if the FHI handler placed the product on an unacceptable pallet, the receiver asks the handler to fix it.

Shane Estep, KVAT's corporate designee under Rule 30(b)(6), testified that KVAT does not consider incoming items to be KVAT's property until after they have been unloaded and stacked by FHI, inspected and accepted by a KVAT receiver, and a KVAT location label sticker has been placed on the plastic wrap around the individual pallets. "It's not [KVAT] property until that checker says it is, that it meets our standards." *Id*. at Ex. 2, KVAT 30(b)(6) Dep. 24, ECF No. 35-2. The load is still sitting on the loading dock at that point.

After the load has been received by KVAT, a KVAT forklift operator goes to the dock, retrieves the merchandise, and takes it to its designated location in the warehouse. Every step of the process after the load has been received is performed by a KVAT employee.

The Agreement provides that FHI will unload trailers at the times and places requested by KVAT at the Abingdon distribution center. There have been occasions where FHI has been short-staffed and KVAT employees (usually supervisors) have unloaded so-called no-touch loads, which are loads that only require unloading of pallets and no physical handling. Those situations are rare, and there is no indication that any KVAT employees were assisting Matney in unloading when the accident occurred. At the time of the accident, Matney was moving two pallets of merchandise, unloading an inbound delivery from a third-party shipper. Specifically, he was moving pallets from one bay area to another bay area in preparation for stacking them on the dock.

KVAT owns another warehouse north of Abingdon where it stores overstock product that can be stored without being placed on racks. FHI does not unload the trucks at that facility. KVAT's employees unload those trucks. KVAT employees also unload KVAT trucks delivering goods from the warehouse to the individual grocery stores.

FHI employees are only present at the distribution facility during the first shift, when inbound deliveries are made. FHI employees are not on site during the second shift, when shipments to stores leave the warehouse. FHI plays no role in shipping merchandise out of the warehouse.

Estep, on behalf of KVAT, testified that KVAT employees did not routinely take part in unloading inbound deliveries and that Matney was not performing work that was part of KVAT's trade or business. Various witnesses conceded, however, that KVAT cannot operate its grocery business if inbound delivery trucks are not unloaded. Sawyer testified that sometimes FHI employees would unload KVAT trucks and KVAT would pay FHI for that unloading. Matney testified that Dave Eskridge, the KVAT dock lead, would sometimes tell him and other handlers where to stack pallets they were unloading.

Harris received Virginia workers' compensation benefits for the injury he suffered. FHI contends that Harris' suit is barred by the VWCA because FHI was not an "other party," but was instead Harris' statutory co-employee. FHI has moved to dismiss or, in the alternative, for summary judgment, because it contends that it was not a stranger to KVAT's trade or business and is therefore entitled to the protection of the VWCA's exclusive remedy provision.

## II.

FHI has moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(1), arguing that the exclusivity provision of the Act is a jurisdictional matter. In the alternative, it asks that the court treat its motion as one for summary judgment under Federal Rule of Civil Procedure 56. Harris argues that Rule 56 is the appropriate vehicle for deciding whether a claim is barred by the

exclusivity provision of the Act. The parties agree that under either Rule, I may

consider evidence outside the pleadings.

On several occasions, the Fourth Circuit has affirmed decisions of district

courts deciding this issue under Rule 12(b)(1). *See, e.g.*, *Demetres v. E. W. Constr.*

*Inc.*, 776 F.3d 271, 272 n.1 (4th Cir. 2015) (noting that because outcome would be

the same under Rule 12(b)(6) as under Rule 12(b)(1), "we have no need to decide

that issue and proceed as if East West's motion properly invoked Rule 12(b)(1)");

*McLaughlin v. Safeway Servs., LLC*, 429 F. App'x 347, 348 (4th Cir. 2011)

(unpublished); *Meredith v. Honeywell Int'l, Inc.*, 245 F. App'x 325, 327 (4th Cir.

2007) (unpublished); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 644-45 (4th Cir.

1999). Another judge of this court, however, has determined that the workers'

compensation bar does not bear upon the court's subject-matter jurisdiction.

*Graves v. Cook*, No. 7:01CV00533, 2002 WL 598416, at *1 n.1 (W.D. Va. Apr.

17, 2002). The *Graves* court reasoned as follows:

> Federal jurisdiction over the subject matter of this claim is proper on
> the basis of [28 U.S.C. § 1332(a)]. Cook removed this case on the
> basis of diversity jurisdiction, and she does not contest it now. Instead,
> she argues that the Virginia Workers' Compensation Act bars Graves'
> claim. That argument goes to the merits of Graves['] claim, not to
> federal subject matter jurisdiction. If the court were to consider the
> Virginia Workers' Compensation Bar as a jurisdictional question, then
> the Virginia General Assembly would effectively determine the limits
> of federal jurisdiction. Federal jurisdiction is limited by the United
> States Constitution and by Congress, not by state legislatures.

. . . .

> [J]udicial economy is best served here by treating Cook's argument under the proper rule, as opposed to dismissing her claim and waiting for her to re-file the same arguments under a different heading. Finally, by construing Graves' claim under 12(b)(6), the court avoids the res judicata problems that might arise by dismissing the claim for lack of jurisdiction.

*Id.*; *see also Armendarez v. ABB, Inc.*, No. 7:07CV00557, 2008 WL 4610282, at *4 (W.D. Va. Oct. 16, 2008) (deciding the issue on summary judgment for the same reasons).

Although the *Graves* and *Armendarez* decisions are not binding precedent, I find their reasoning persuasive and will follow them. While the Supreme Court of Virginia has at times referred to the Act's exclusive remedy provision as a jurisdictional bar,[4] the matter in fact goes to the merits of Harris' claim rather than to this court's subject-matter jurisdiction, which cannot be limited by state courts or legislatures. I will therefore treat FHI's motion as one for summary judgment.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To raise a genuine issue of material fact sufficient to avoid summary judgment, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, "the

---

[4] *See, e.g., Jones v. Commonwealth*, 591 S.E.2d 72, 76 (Va. 2004); *Plummer v. Landmark Commc'ns, Inc.*, 366 S.E.2d 73, 87-88 (Va. 1988).

court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). Summary judgment is not a disfavored procedural shortcut, but an important mechanism for weeding out claims and defenses that have no factual basis. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). "Rule 56 expressly contemplates the availability of summary judgment to a claimant. That a movant bears the ultimate burden of proof or persuasion . . . is no obstacle to a summary judgment award in favor of that party, so long as the requirements of Rule 56 are otherwise satisfied." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 521–22 (4th Cir. 2003) (citations omitted).

## III.

In this diversity case, I must apply the substantive law of Virginia, the forum state. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78–79 (1938). The Act states that an injured employee whose injury is covered by the Act cannot recover against his employer or co-employee in a common-law action. Va. Code Ann. § 65.2-307(A); *Kohn v. Marquis*, 762 S.E.2d 755, 757 (Va. 2014); *Jones v. Commonwealth*, 591 S.E.2d 72, 74 (Va. 2004) ("The exclusivity rule provides that when an employee is eligible for remedy under the Act, he or she may not seek any other remedy against the employer or his fellow employees.") "Likewise, an employee is barred from bringing such an action against a party who is not the employee's common law

employer if that employer is nevertheless a 'statutory employer' under Code § 65.2–302(A)." *Rodriguez ex rel. Estate of Rodriguez v. Leesburg Bus. Park, LLC*, 754 S.E.2d 275, 278 (Va. 2014) (citation omitted).

The Act contains an exception that allows an injured employee to bring a claim against an "other party." Va. Code Ann. § 65.2-309(A). "[T]o be an 'other party,' a defendant must have been a stranger to the trade, occupation, or business in which the employee was engaged when he was injured." *Peck v. Safway Steel Prods., Inc.*, 551 S.E.2d 328, 329 (Va. 2001); *see also Evans v. Hook*, 387 S.E.2d 777, 779 (Va. 1990) (explaining that "because he is not a 'stranger to the employment,' an allegedly negligent employee of one contractor, engaged in the same business or project of an owner as an injured employee of another contractor, is not an 'other party' amenable to suit under Code § 65.1–41"). "Whether a third party is engaged in the trade, occupation, or business of the employer depends upon the facts and circumstances in each case, and for that reason the question does not readily yield to categorical or absolute standards." *Conlin v. Turner's Express, Inc.*, 331 S.E.2d 453, 455 (Va. 1985) (internal quotation marks and citation omitted); *see also Rodriguez*, 754 S.E.2d at 278 (noting that the issue is "a mixed question of law and fact").

Where an owner's employee is injured by the employee of a subcontractor, known as a descending negligence claim, courts apply the "stranger to the work"

test to determine whether the subcontractor is an "other party" subject to suit or a statutory co-employee entitled to the protection of the Act's exclusive remedy provision. *Stone v. Door-Man Mfg. Co.*, 537 S.E.2d 305, 310 (Va. 2000). This case presents such a descending-negligence claim. Here, KVAT is the owner and FHI most closely resembles a subcontractor. The stranger-to-the-work test "requires that the facts of each case be analyzed to determine whether the defendant in a common-law action was, at the time of the plaintiff's injury, a stranger to the work in which the plaintiff was engaged." *Whalen v. Dean Steel Erection Co.*, 327 S.E.2d 102, 105 (Va. 1985). If the defendant was a stranger to the work in which the plaintiff's employer was engaged, the plaintiff's claim is not barred by the Act. *Id.*; *Fowler v. Int'l Cleaning Serv., Inc.*, 537 S.E.2d 312, 315 (Va. 2000). The Supreme Court of Virginia has clarified that the test is not whether the defendant-subcontractor was performing a service that was essential to the owner, but rather whether the defendant was a stranger to the owner's "particular business." *Napper v. ABM Janitorial Servs.-Mid Atl., Inc.*, 726 S.E.2d 313, 318 (Va. 2012).

Applying the stranger-to-the-work test to this case, the issue is whether FHI was a stranger to KVAT's work of grocery retail and warehousing. After carefully considering the evidence and the long line of Virginia precedent on this issue, I conclude that FHI was a stranger to that work. FHI merely unloaded incoming

goods from third-party trucks and stacked them on the loading dock of the

distribution facility. It did not take the goods into the warehouse to store them.

These were primarily goods being delivered to KVAT in the first instance, not

goods being transported between KVAT locations. Unlike in *Conlin*, 331 S.E.2d

at 456, FHI does not unload or otherwise participate in KVAT intrafacility

deliveries. FHI was paid by the shippers, not by KVAT. If FHI were not doing

this unloading, it would be performed by the shippers' truck drivers or by third-

party lumpers, not by KVAT warehouse employees. As in *Cinnamon v.

International Business Machines Corp.*, 384 S.E.2d 618, 622 (Va. 1989), KVAT

had never assigned the work of unloading inbound deliveries to its own employees.

In support of its argument that it was not a stranger to KVAT's work, FHI

cites several cases that are instructive but distinguishable. In *Floyd v. Mitchell*,

123 S.E.2d 369 (Va. 1962), an employee of a trucking company was run over by

an employee of a pipe manufacturer while preparing to load pipes onto a truck to

be shipped to the pipe manufacturer's customers. The Supreme Court of Virginia

held that the estate's action against the pipe manufacturing company was barred by

the Act, reasoning as follows:

> [The pipe company's] trade, business or occupation was
> manufacturing pipe and selling and shipping it to its customers.
> Transporting the pipe to the customers was a necessary element of this
> business. The loading of the pipe on the vehicles that would carry it to
> its destination was an essential part of this element of the business.
> [The deceased's] job was to supervise and assist in the loading

process. He and [the pipe company's employee] worked together in this part of [the pipe company's] business. [The pipe company] contracted with [the trucking company] to transport the pipe to [the pipe company's] customers, a part of [the pipe company's] business which [it] could have done with its own employees and its own equipment had it determined that to be a better way. The fact that it engaged [the trucking company], an independent contractor, to transport the pipe did not make [the trucking company] strangers to [the pipe company's] business.

*Id.* at 372. Importantly, *Floyd* involved the loading of outbound shipments to customers, not inbound deliveries of materials to the manufacturer, which changes the analysis.

In *Hayden v. Kroger Co.*, 17 F.3d 74 (4th Cir. 1994), a third-party truck driver was injured while unloading his truck at a Kroger distribution center. He asserted an ascending-negligence claim against Kroger, but the district court and ultimately the court of appeals held that the suit was barred because Kroger was the driver's statutory employer. *Id.* at 77. The evidence in that case was that Kroger employees unloaded approximately 20% of incoming deliveries. *Id.* The court of appeals stated, "It is essential to Kroger's business that such unloading continuously take place. Furthermore, Kroger owns its own fleet of trucks and employs drivers to transport, load and unload goods at various Kroger-owned facilities." *Id.*

FHI relies heavily on *Hayden*, arguing that it controls the outcome here. Harris notes, however, that *Hayden* was published several years before *Bosley v.*

*Shepherd*, 554 S.E.2d 77 (Va. 2001), and argues that *Hayden* would be decided differently today in light of *Bosley*. Judge Hall dissented in *Hayden*, finding that the driver was merely a delivery person and not a statutory employee of Kroger. *Hayden*, 17 F.3d at 77 (Hall, J., dissenting). Harris argues that the Kroger dissent reached the correct conclusion and represents how the case would be decided today, in light of more recent Virginia Supreme Court precedent. An additional distinction is that in *Hayden*, Kroger employees unloaded 20% of deliveries, while here, the evidence shows that KVAT employees unload at most 5% of inbound deliveries. KVAT's involvement in unloading is thus much rarer in this case than was Kroger's involvement in unloading in *Hayden*.

While the Hayden majority reasoned that continual unloading of grocery deliveries is essential to the grocery business, the Supreme Court of Virginia has since explained that this is not the test. *Napper*, 726 S.E.2d at 318. Instead, as noted above, courts should ask whether the defendant was a stranger to the employer's "particular business." *Id.* And in an unpublished decision issued 13 years after *Hayden*, the Fourth Circuit noted that "[t]he Virginia Supreme Court consistently has held that there is no statutory employer/employee relationship where the injured independent contractor was delivering a third-party's or the contractor's own materials to the job site." *Meredith*, 245 F. App'x at 328 n.6 (citing cases, but holding that transporting product *between the owner's plants* was

part of owner's business that was often performed by owner's employees, and trucking company was therefore not an "other party").

In *Bosley*, the court noted that it had "held repeatedly that a subcontractor's employee who merely delivers materials to a job site is not engaged in the trade, business, or occupation of the general contractor." 554 S.E.2d at 81. "In contrast, when an injured employee's duties extend beyond delivery of materials to the job site, and the employee performs an act that is an essential part of the work of the general contractor, the injured employee has engaged in the trade, business, or occupation of the general contractor." *Id.* *Bosley* involved an employee of a subcontractor who was injured while delivering sheetrock to a general contractor. The *Bosley* court stated that the case was controlled by *Burroughs v. Walmont, Inc.*, 168 S.E.2d 107 (Va. 1969). *Id.* The dissent in *Hayden* had also relied on *Burroughs*.

> Like the plaintiff in *Burroughs*, Shepherd was injured while placing sheetrock at a construction site in locations specified by the general contractor and its employees. The nature of the work that Shepherd performed is not altered by the fact that he used a crane to place the materials at the required locations. *His actions remained ones of delivery, not of construction, because when he used the crane to place sheetrock at the specified locations, he did not engage in any other action regarding the sheetrock to further the work of the general contractor.* Therefore, we hold that the trial court correctly concluded that Meredith was not Shepherd's statutory employer but was an "other party" subject to being sued by Shepherd in this common law negligence action.

*Bosley*, 554 S.E.2d at 82 (emphasis added).

Here, the relationship between FHI and KVAT is analogous to the relationship between the subcontractor and the general contractor in *Bosley* and *Burroughs*. FHI's job was to unload deliveries and stack the goods in the places and configurations directed by KVAT. FHI performed no other aspect of KVAT's warehousing or grocery retail business. When FHI finished unloading and stacking the goods, those goods had not yet been accepted by KVAT and remained on the loading dock. Any warehousing functions were performed by KVAT's employees after receiving the goods. I find that the undisputed record evidence establishes that FHI was a stranger to KVAT's work of grocery retail and warehousing and performed only a final act of delivery. Harris' suit against FHI is therefore permitted by the Act.

IV.

For the foregoing reasons, it is **ORDERED** that the Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 34, is GRANTED as to defendant Freight Handlers, Inc., and is otherwise DENIED. The Clerk shall terminate Freight Handlers, Inc., as a party to this case.

ENTER: November 8, 2019

/s/ *JAMES P. JONES*
United States District Judge